13923

WILLIAMS v. METROPOLITAN LIFE INS. CO.

(176 S. E., 340)

*Messrs. Carlisle, Brown & Carlisle, Elliott, McLain, Wardlaw & Elliott* and *McDonald, Macaulay & McDonald,* for appellant,

450

*Messrs. Hemphill & Hemphill,* for respondent, 

October 11, 1934.

The opinion of the Court was delivered by MR. CHIEF JUSTICE BLEASE.

The defendant insurance company has appealed from a verdict, and judgment thereon, for both actual and punitive damages rendered against it in favor of Williams, as administrator of the estate of his deceased son, in the Court of Common Pleas for Chester County.

The defendant makes little, if any, complaint of the result as to actual damages, the amount of the policy, and interest thereon.

One of the exceptions, directed to the refusal of the ██ trial Judge to grant a continuance, if sustained, might affect the judgment as to actual damages, but clearly, there is no merit in the position that there was error of law in refusing the desired continuance. The granting of a continuance is so largely within the discretion of the trial Judge

that this Court hardly ever interferes with a ruling there-about. In this instance, the continuance was requested be-cause of the absence of Dr. J. B. McKeown, a witness for the defendant. But the plaintiff readily agreed to allow the defendant to offer in evidence a sworn written statement of Dr. McKeown as to what his testimony would be, and this statement was offered.

It is not necessary that exceptions, alleging error in the charge to the jury, be considered, for, under our view, if the instructions were erroneous, which we do not concede, they would not have affected the verdict for actual damages.

The main question in the appeal relates to the exceptions, based on the failure of the presiding Judge to grant the de-fendant's motions for a nonsuit and for a directed verdict as to punitive damages. Regarding the propriety of grant-ing those motions, the learned Circuit Judge, Hon E. C. Dennis, expressed himself as being in great doubt. He in-dicated, however, in his rulings thereon, that the termination of the litigation would be expedited by his declining to grant them, the final decision resting, as he stated, with this Court.

The action, one for the alleged breach of contract, ac-companied by fraudulent acts, grew out of the declination of the company to pay a life insurance policy.

It was alleged by the plaintiff, and admitted by the de-fendant, that the plaintiff's son, Floyd A. Williams, on Sep-tember 12, 1928, placed with an agent of the company his application for the policy involved in the suit, one on his life in the sum of $218.00, the premiums thereon being 10 cents per week; that the policy was delivered to the insured on October 1, 1928; that the premiums were regularly and promptly paid by the father of the insured; and that the in-sured died on December 23, 1928.

In the written application, the applicant for the insurance agreed that "the policy shall not be binding upon the Com-pany unless upon its date I shall be alive and in sound

health." Therein the applicant also represented that he had "never had any of the following complaints or diseases: * * * consumption * * * disease of kidneys * * * disease of lungs," and also represented that he had not been "under the care of any physician within three years" of the date of his application.

The applicant was examined on September 14, 1928, by Dr. P. S. Thomas, the medical examiner of the company, who died before the trial of the case. That physician, as well as J. M. Crawford, the agent of the company who took the application, recommended the issuance of the policy.

The policy contained what is termed a "facility of payment clause," in the following language: "The Company may make any payment or grant any non-forfeiture privilege provided herein to the Insured, husband or wife, or any relative by blood or connection by marriage of the Insured, or to any other person appearing to said Company to be equitably entitled to the same by reason of having incurred expense on behalf of the Insured, or for his or her burial; and the production of a receipt signed by either of said persons, or of other proof of such payment or grant of such privilege to either of them, shall be conclusive evidence that all claims under this Policy have been satisfied."

Among the conditions contained in the policy, it was provided: "If, (1) the insured is not alive or is not in sound health on the date hereof, or if (2) before the date hereof, * * * the insured * * * has, within two years before the date hereof, been attended by a physician for any serious disease or complaint, or, before said date, has had any pulmonary disease, * * * unless such medical attention or previous disease is specifically recited in the 'space for endorsements' on page 4 in a waiver signed by the secretary; * * * then, in any such case, the company may declare this policy void and the liability of the company in the case of any such declaration or in the case of any claim

under this policy, shall be limited to the return of premiums paid on the policy."

In the "space for endorsements" on the policy, there was not recited any medical attention, or previous disease, as required in the quoted clause..

On December 24, 1928, the day following the death of the insured, the agent of the company called at the home of the father, where the insured had lived and died, for the purpose of preparing the proofs of death. The proofs, as sent in to the district manager, consisted of Form No. 65, termed "Claimant's Statement," and Form No. 66, "Physician's Statement."

In the claimant's statement, which was filled out by the agent, certain information, more or less pertinent to the issue for our determination, was set forth as follows: The date of birth of the insured was given as March 31, 1908; the place of birth as York County; the date of death, December 23, 1928; the cause of death, "acute tuberculosis"; the duration of his last sickness, two months; the date when the deceased first consulted a physician in his last illness was fixed at October 1, 1928; and the date on which the deceased quit work was stated to be October 1, 1928. Therein there was purported to be set forth the names and ages of the father, mother, brothers and sisters of the insured.

In the physician's statement, made by Dr. J. B. McKeown, the age and apparent age of the insured was placed at twenty-one years. The cause of his death was stated to have been "pulmonary tuberculosis," the duration of which, according to the physician's knowledge, was three months, thirteen days, and, according to the history given him, four months. It was stated by the physician that his first visit in the last illness was September 13, 1928, and his last visit on November 16, 1928, and that the deceased had been ill when the physician was first called "about three or four weeks," and that death occurred on December 23, 1928.

The pertinent allegations of the quite lengthy complaint, as to the alleged fraudulent acts of the company and Crawford, its agent, were to this effect: Upon the death of the insured, that fact was communicated to the agent, and, in response thereto, the agent went to the plaintiff's home, having with him "proof of death blanks"; that he falsely and deceitfully represented to the plaintiff that the defendant would gladly pay the face of the policy"; the agent requested the surrender of the policy, which plaintiff refused, but the plaintiff did surrender the premium receipt book; that the agent informed the plaintiff that he must sign his name to certain blanks; that, if the plaintiff would sign these papers "in blank," the agent "would properly and correctly complete said proof of death blanks," and defendant would pay him within a few days the amount due on the policy; that, relying upon the representations of the agent, the plaintiff trustingly signed his name "to all proofs of death blanks wherever he was told to sign same," and delivered the premium receipt book; that the company and its agents well knew all the material facts concerning the health and personal history of the insured at and before the time of the issuance of the policy, and that they knew the insured "was in sound health and an insurable risk"; for the purpose, and with the intention, of cheating and defrauding the plaintiff out of the money due to him under the terms of the policy, and to place the defendant in the position where it could deny legal liability thereunder, the agent of the company "improperly and incorrectly filled out and completed" the said proofs of death.

The gist of the allegations as to the fraudulent conduct on the part of the agent, as it will be noted, was that he did not, as he promised the plaintiff he would do, fill out properly and correctly the proofs of death.

Perhaps the complaint was properly subject to a motion to have its allegations, as to the manner in which the proofs of death were incorrectly filled out, made more definite and

certain. That motion was not made, however, and, accordingly, the plaintiff was permitted, in the trial, much liberality in endeavoring to establish the errors in the proofs of death which he claimed had been made.

In his testimony, the plaintiff, sole witness for himself, said that he was a textile operative, and had very little education, and that his son had been engaged in the same class of work. He related that, at the time the application for insurance was made by his son, the latter told Crawford, the agent, that a few days previous to the application he had become chilled, on account of going in bathing, and had consulted Dr. McKeown about his condition; that the physician had given him some powders to take, but had indicated that the ailment he complained of was of no consequence, and, upon receipt of this information, the agent had said, "That don't amount to a row of pins." The witness swore that the health of his son, at the time of the making of the application and delivery of the policy, was good. Referring to the illness and death of his son, he testified that the young man had never had consumption or tuberculosis, or any symptom of such disease. He said that his son had not been regularly employed a while before his illness, but that he had assisted the witness in his work in the mill. The son, according to him, first became ill in November, 1928, complaining of his kidneys; that he was confined to his bed "just a few days" before his death on December 23rd. From the symptoms and condition of his son, the witness was able to say that his illness and death were due to some kidney affection. He further testified to this effect: That on the day of the death of the insured, he notified Crawford of the occurrence, and of his need of financial assistance to help in the funeral of the young man; that, pursuant to a promise of Crawford, the latter visited the plaintiff's home on the following morning; that there he told plaintiff that the company would be glad to pay the amount of insurance, and payment would be made within a few days; that at the agent's request he

signed the proofs of death in blank, upon the promise and assurance of the agent that the latter would have them filled out properly; that the agent asked for the policy, which request was refused, but that he did deliver the premium receipt book to the agent. Upon several occasions, after the burial of his son, he saw Crawford, who informed him from time to time that "he had not heard a thing" about the insurance, but "it ought to be there in a day or two." He did not know what had become of the blanks he had signed, and had not seen them since the day he signed them at his home. Finally, about three weeks after the funeral, he was informed by Crawford that the company would not pay the amount of the policy, and the agent offered to return to him the sum of $1.20, premiums he had paid on the policy, which he declined to accept. At the time of this tender, Crawford told him, in effect, that he did not blame him for refusing the money, and said he thought the company was due the plaintiff the amount of the policy. He further claimed that Crawford also said "he knew the company would not pay it whey they got him to sign the blanks"; and he had not told the plaintiff of this earlier, as he wanted him to continue other policies he had with the company. Two or three months later, he was informed by a firm of attorneys, whom he had consulted about his claim, that the company had again denied liability, on the ground that the insured was not in sound health at the time the policy was delivered, and he had returned to him the receipt book, which he had formerly turned over to the agent. He brought this action on December 22, 1932.

The principal testimony on the part of the defendant, and that which especially related to the charges of fraudulent conduct, was given by the agent, Crawford. He testified as to taking the application and delivering the policy, and said that at those times he was of the opinion that the insured was in good health, he not having been advised to the contrary. On the day following the death of the young man, ac-

cording to his usual custom, he went to the home of the plaintiff for the purpose of getting proper proof of death to be signed by the claimant. In the "Claimant's Statement," signed by the plaintiff, he inserted the required information as to the ages of the father, mother, brothers and sisters of the deceased, the time he became ill, and the duration of the illness, and all other information set forth in the statement, as it had been given by the plaintiff, with the sole exception of the answer to the question as to the cause of death. The answer to that particular question he did not insert, following the usual custom of advising with the attending physician before answering it, so that the answer in the claimant's statement and that in the physician's statement would correspond. The only paper signed by the plaintiff at the time was his one signature to the claimant's statement, which was witnessed by the agent. The physician's statement was witnessed by the agent. The cause of death in the claimant's statement, "acute tuberculosis," was inserted by the agent after he had seen the statement of Dr. McKeown, this being done by the agent according to his usual custom. The proofs were sent by the agent to the district manager on December 27th. Accompanying them, Crawford wrote the manager, advising him that the plaintiff was not willing to give up the policy without settlement, as explanatory of the failure to do the usual thing of sending in the policy with the proofs of death. In the letter, Crawford said, "From the doctor's statement it would seem that we are going to have some trouble with this claim." He concluded his communication with a statement to the effect that he would be willing "to furnish any information that is desired." Promptly, on December 28th, the district manager returned the proofs of death to Crawford, for the reason that the claimant had failed to attach his signature to an agreement in connection with the physician's statement, that that statement should be considered as part of the proof of death, in accordance with the conditions of the policy. In returning the papers, the

district manager advised Crawford that it was not necessary that the policy be taken up at the time, and requested the agent for a letter of explanation "as to how the business was written, the physical condition at the time the application was signed and any other information that would show the company the condition at the time the application was made." Attention was called to the fact that Dr. McKeown had stated in the statement he had furnished that the first visit he made to the insured was on September 13th, who had been ill for about three or four weeks when the physician was first called. Crawford said he procured the necessary signature from the plaintiff, and at that time the latter saw the information contained in the proofs of death. On December 31st Crawford again sent the papers to the district manager. He also informed, by letter, that official that that he was of the opinion "that the claimant and insured at the time of the application were sincere in their statement when they said that they had never been under the care of physician"; that the application was written about the same time the doctor was called in, "and it must have been some time before he pronounced this T. B."; that he had the impression that the insured "was just an overgrown boy, very tall and thin," and he thought he was employed at the time of the application.

The affidavit of Dr. McKeown, dated November 9, 1933, admitted in evidence, was to the effect that the plaintiff brought the insured to the office of the physician on September 13, 1928; upon examination, he "found the young man suffering with pulmonary tuberculosis in an advanced stage"; that the patient was advised to go home and go to bed, and he outlined for him a regular tuberculosis treatment. On September 15th he called to see the patient, and began preparations to apply for his admission to the tuberculosis hospital at State Park, where he hoped he might have him admitted, but the hospital was so crowded that he could not secure his admission; that he went to see him

again on September 19, 1928, but had not found in his records any entry of any other visits.

Regardless of our own view of the evidence, for the purpose of a decision, we accept the construction placed upon it by the plaintiff's counsel as to the incorrect statements, materially affecting the defendant's liability, under the terms of the policy, inserted in the claimant's statement by Crawford. In their argument, they charge this statement contained "information which was false and untrue in the following particulars; (a) the cause of death was put down as acute tuberculosis, when in truth the cause of death was kidney trouble; (b) the duration of last sickness was put down as two months, when in truth it was only three weeks; (c) the date on which deceased had first consulted a physician for his last illness was put down as October 1st, 1928, when in truth the deceased was then in sound health; (d) the date on which deceased had quit work was put down as October 1st, 1928, when in truth and in fact the correct date was the last of November, or the first of December, 1928."

Conceding that the information was not correct, even following the theory of the plaintiff that it was "false and untrue," we are confronted with the very important question, "Who was responsible for the 'false and untrue information'?"

If Crawford's testimony as to the source of the information should be accepted without question, the responsibility for all the incorrect information, with the exception of the answer to the question as to the cause of death, rests with the plaintiff. The excepted answer, according to him, was based upon the information obtained from the physician, and the responsibility for that statement, if incorrect, rests upon the physician.

Considering, however, the evidence in a light most favorable to the plaintiff's cause, and to that end declining to accept the evidence of Crawford, what do we find? First, that Crawford, after his personal inspection of the insured at the

time the application was made, had no personal knowledge of his physical condition. Second, that, according to the plaintiff's own testimony, at the time he signed for Crawford in blank the proofs of death, he gave no information whatever as to the cause of death of his son, or any other fact relating in anywise to his illness; that the agreement between the agent and the plaintiff according to the very last statement made by the plaintiff on the witness stand, was that the agent "said he would have them (the proofs) filled right." What was the meaning of having the proofs "filled right"? Did it not mean that the company must be given information that was truthful? Could it have meant that Crawford was to prepare the proofs so that the plaintiff could collect the insurance, regardless of the real facts? We certainly cannot assume that, for to do so would be to assume a conspiracy against the company on the part of the plaintiff and the agent. When the plaintiff, according to his version, had given Crawford no information upon which he might act to "fill the proofs right," to whom could Crawford go for the information, except to the attending physician? If the answers Crawford wrote in the claimant's statement were not based on information he received from the plaintiff, and the plaintiff so testified, the only other reasonable inference to be deduced from the evidence is that those answers were based on information he obtained from the physician. That physician was supposed to know the facts, to know them even better than the plaintiff knew them, and Crawford might safely assume that the physician would give truthful information; that physician was not the representative of the company or of its agent; that physician spoke for himself and for the family of the insured.

If there were some minor differences in the answers to the questions in the claimant's statement, and the answers to similar questions in the physician's statement, and a comparison of the statements so discloses, it must be apparent that the answers written in by Crawford were more favor-

able than those of the physician to sustain the liability of the company, under the terms of the policy. When the answers to the questions, as written by Crawford, were more favorable to the claim of the plaintiff than were the answers of his own physician to the same questions, can it be successfully charged that Crawford was endeavoring to commit a fraud on the plaintiff? On the contrary, would it not appear from the information Crawford did give in the statement, from his letters to the district manager, as to the acceptance of the application and issuance of the policy, and from his advice to the plaintiff not to accept the tender of a return of the premiums, that Crawford was seeking to aid the plaintiff in the collection of the amount of the policy? Those things being true, according to undisputed testimony, how could the plaintiff charge Crawford with fraudulent acts to the plaintiff's detriment?

There is another matter of great significance. The plaintiff testified that his son died of a disease of the kidneys. Granting that to be true, although the evidence of Dr. McKeown is in direct conflict therewith, there is not the least evidence to show that Crawford was ever advised that the cause of death was a kidney affliction. Unless he had information that the cause of death was a kidney trouble, how could Crawford have been expected to insert in the claimant's statement the cause of death as being a disease of that character? How could he be charged with fraud in failing to insert kidney trouble as the cause of death, unless he had knowledge or information that such was the truth?

It must not be overlooked, either, that under the terms and conditions of the policy, and the application upon which it was issued, that the insurance company had the same right to decline payment if there had been misrepresentation on the part of the insured as to his suffering from an ailment of the kidneys, as the company had the right to defend on the ground of misrepresentation as to consumption or tuberculosis. If the plaintiff, or some one else, had informed

Crawford that the cause of death was a kidney disease—but there was no such testimony—and if Crawford had desired to put the plaintiff in a position of disadvantage, it would have been just as easy for him to insert in the claimant's statement the cause of death as a kidney trouble. If the true cause of death had been inserted, as the plaintiff testified what it was, the result to him would have been the same, if the company insisted upon its legal rights. That result would have been a declination to pay the policy.

The company is charged with wrongdoing only through the acts of Crawford. When there is no evidence of a fraudulent act on the agent's part, it is clear that the company cannot be held liable for fraud.

On the information submitted to it in the proofs of death, that coming from the statement of the physician more than from the information contained in the claimant's statement, the insurance company could have properly reached the conclusion that there had been a violation of the terms and conditions upon which the policy had been issued on the part of the insured. Whether or not there had been a violation of those terms and conditions, the company, under the law, could decline payment of the policy without subjecting itself to punitive damages, unless the company, through some one of its agents, was guilty of fraudulent conduct in connection with the breach of its contract. The legal principles applicable to that proposition, and to the other propositions involved in this case, seem to be agreed upon by the counsel for both parties. Those principles, in brief, are as follows:

Punitive damages are not recoverable for a mere breach of contract. To recover damages of that character, the plaintiff must show that the breach was accomplished with a fraudulent intention, and was accompanied by a fraudulent act. *Welborn v. Dixon*, 70 S. C., 108, 49 S. E., 232, 3 Ann. Cas., 407; *Holland v. Spartanburg-Herald-Journal Co.*, 166 S. C., 454, 165 S. E., 203,

84 A. L. R., 1336; *Derrick v. Insurance Co.*, 167 S. C., 434, 166 S. E., 502; and many other cases too numerous to be cited.

Acts of willfulness, accompanying the breach of a contract, unless there is fraud also, will not support a claim for punitive damages. *Holland case, supra.*

The mere violation of a contract is not sufficient to support an allegation of fraud. *Holland case, supra; Caldwell v. Duncan*, 87 S. C., 331, 69 S. E., 660; *Coleman v. Stevens*, 124 S. C., 8, 117 S. E., 305.

A study of the whole case convinces us that there was evidence to sustain plaintiff's recovery of his actual damages, the amount due on the policy, and the interest thereon, for there was some evidence that the defendant breached the contract of insurance. Even if the insured was not in good health at the time of the issuance of the policy, there was some evidence to show a waiver on the part of the company, through Crawford, the agent, as to the condition of his health. There was no evidence, however, of a breach, accompanied by fraud, and, under the authorities mentioned, the plaintiff was not entitled to punitive damages.

The judgment of this Court is that the judgment as to actual damages be, and the same is hereby affirmed; that the judgment as to punitive damages be, and the same is hereby, set aside, with directions that a verdict in favor of the defendant be entered up as to that issue.

Messrs. Justices Stabler, Carter and Bonham and Mr. Acting Associate, Justice W. C. Cothran concur.